**UNITED STATES of America,**
Plaintiff,

v.

**The BAYER COMPANY, Inc. (New York); Sterling Products (Incorporated) (Delaware); Albert H. Diebold; William E. Weiss; and General Aniline & Film Corporation, Defendants.**

United States District Court
S. D. New York.

Oct. 10, 1955.

See also, 105 F.Supp. 955.

Stanley N. Barnes, Asst. Atty. Gen., Ephraim Jacobs, Richard B. O'Donnell, Special Assts. to the Atty. Gen., Wilbur L. Fugate, Daniel H. Margolis, Trial Attys., Washington, D. C., for plaintiff.

Winthrop, Stimson, Putnam & Roberts, New York City, Peter H. Kaminer, Herbert L. Abrons, Merrell E. Clark, Jr., New York City, of counsel, for defendant General Aniline & Film Corp.

WEINFELD, District Judge.

In this action charging violation of § 1 of the Sherman Act[1] the government moves for summary judgment against the defendant General Aniline & Film Corporation, hereinafter called "General Aniline". General Aniline cross-moves for summary judgment in its favor.

The motions are based on the pleadings, exhibits, requests for admissions, answers to interrogatories and affidavits. Each party in support of its motion urges that no genuine issue exists as to any material fact and that it is entitled to prevail.

The action has had a rather long history. General Aniline was not named as a defendant when the action was commenced in September, 1941. The original defendants were The Bayer Company, Inc. (New York) (hereinafter referred to as "Bayer"), Sterling Products (Incorporated) (Delaware), (hereinafter referred to as "Sterling"), and two individual officers of Sterling.

The complaint charged those defendants with combining and conspiring to restrain interstate and foreign trade and commerce in pharmaceutical products in violation of § 1 of the Sherman Act. It alleged that the conspiracy resulted in and was furthered by two agreements, one dated April 9, 1923 between Bayer and a German company, known as and referred to herein as Leverkusen; the other dated November 15, 1926 which modified and confirmed the earlier agreement and was executed by Bayer and I. G. Farbenindustrie Aktiengesellschaft of Germany (herein referred to as "I. G. Farben") which succeeded to Leverkusen's interest. These agreements, the provisions of which will be considered in greater detail, are referred to herein as the 1923 and 1926 agreements, or the Bayer contract. The present controversy centers about a provision of the agreements under which Bayer agreed to pay I. G. Farben for a period of 50 to 55 years one-half of the net profits derived by Bayer from its business in Cuba, one of the countries where Bayer was given exclusive sales rights for designated pharmaceutical products.

Upon the filing of the complaint in September, 1941, the original defendants consented to the entry of a decree adjudging the 1923 and 1926 agreements to be unlawful under the anti-trust laws.[2] The decree enjoined Bayer and Sterling (which owned Bayer), their successors and subsidiaries, from carrying out or enforcing the contracts or from paying to I. G. Farben, its successors or assigns, any royalties or share of profits under the contracts with respect to its sales. It is this latter provision which accounts for the present proceeding.

In 1930 I. G. Farben issued a letter of instructions to Bayer to pay its (Farben's) share of the Cuban profits under the 1923 and 1926 agreements to American I. G. Chemical Corporation, which I. G. Farben had caused to be organized under the laws of Delaware. In 1931 it directed Bayer to pay the profits to General Aniline Works, Inc. which in 1939, as a result of changes of names and mergers with subsidiaries, became General Aniline & Film Corporation, the present defendant.[3] Bayer made the payments as directed by the instructions to 1940 but

1. 15 U.S.C.A. § 1.

2. United States v. The Bayer Company, Inc., D.C.S.D.N.Y., Civ. 15–364, September 5, 1941.

3. When, in 1929, I. G. Farben organized the American I. G. Chemical Corporation, it guaranteed payment of principal and interest of the new company's initial bond issue of $30,000,000. It also paid $10,000,000 in cash to American I. G. Chemical Corporation and transferred to it 58,000 shares of the stock of General Aniline Works, Inc. and a 50% stock interest in the Winthrop Chemical Company, a Delaware corporation engaged in the prescriptive pharmaceutical business. In March, 1930 American I. G. Chemical Corporation acquired the remaining outstanding shares of General Aniline Works, Inc. On October 31, 1939 the latter company was merged with American I. G. and the name of the latter was changed to General Aniline & Film Corporation, the defendant herein.

refused to make further payments after the entry of the 1941 consent decree.

In 1945 General Aniline, alleging itself to be the assignee of I. G. Farben, commenced an action against Bayer and Sterling in the Supreme Court of the State of New York to recover I. G. Farben's share of the Cuban profits for the years 1941 to 1944. It later filed a supplemental complaint to include the profits for each year from 1945 through 1951. The complaints alleged the due performance by I. G. Farben and its predecessor (Leverkusen) of all the terms and conditions on their parts to be performed under the agreements.

Both Bayer and Sterling pleaded as an affirmative defense impossibility of performance, citing the provisions of the 1941 decree in this action declaring the contracts illegal and enjoining them from making any further payments thereunder. On General Aniline's motion the defense was stricken.[4] The Appellate Division[5] and the Court of Appeals[6] of the State of New York affirmed the order. The underlying rationale of the decisions was the absence of General Aniline as a party to the anti-trust suit, the courts holding that the decree was not binding upon it and that it was entitled to have its day in court to contest the claim of illegality of the Bayer contracts. While the appeal was pending in the New York Appellate Division, the Attorney General applied for, and was granted, leave to serve the supplemental complaint in this action.[7] Thus it came about that in 1952, more than ten years after the entry of the final decree against the original defendants, the government served first a supplemental complaint and then an amended supplemental complaint naming General Aniline as an additional defendant.

The same general relief is sought as had been obtained under the original complaint declaring the 1923 and 1926 agreements to be illegal and in violation of § 1 of the Sherman Act. The amended supplemental complaint, in addition to the allegations in the original complaint, further charges that General Aniline had been and was engaged in a course of conduct designed to carry out and enforce the 1923 and 1926 agreements; that the prosecution by General Aniline of the New York State court action was for the purpose of giving effect to the unlawful contracts, schemes and conspiracies described in the original complaint; that by carrying out such conspiracies, contracts and combinations in restraint of trade and by its acts, General Aniline has directly, substantially and unreasonably restrained trade in pharmaceutical products. The prayer for relief seeks, in addition to a decree outlawing the agreements, to enjoin General Aniline from prosecuting the New York action or taking any other steps to enforce, or to receive the payments under, the contracts. The defendant's motions to dismiss the supplemental and the amended supplemental complaints were denied.[8]

In support of its motion for summary judgment the government contends that but two questions, both purely of law, are presented: first, are the Bayer contracts of 1923 and 1926 illegal per se under the Sherman Act; and second, if they are, should General Aniline, successor to the rights of I. G. Farben, one of the contracting parties, be enjoined from carrying out or enforcing them.

The defendant contends that the legality or the illegality of the 1923 and 1926 agreements is only of historical interest and is irrelevant with respect to the issue of whether General Aniline is entitled to

4. General Aniline & Film Corp. v. Bayer Co., Inc., 188 Misc. 929, 64 N.Y.S.2d 492.

5. Id., 1st Dept., 281 App.Div. 668, 117 N.Y.S.2d 497.

6. Id., 305 N.Y. 479, 113 N.E.2d 844. See Derenberg, The Impact of the Antitrust Laws on Trade-Marks In Foreign Commerce, 27 N.Y.U.L.Rev. 414, 449; Note, Consent Decrees and Absent Cartel Participants, 56 Yale L.J. 396.

7. Pursuant to 15 U.S.C.A. § 5.

8. United States v. Bayer Co., Inc., D.C. S.D.N.Y., 105 F.Supp. 955; Id., Civ. 15–364, decided October 16, 1952 (unreported).

summary judgment. General Aniline urges that the government has failed to prove that it, as distinguished from I. G. Farben, its assignor, is presently violating or threatens any violation of the Sherman Act; further, that the prosecution of the law suit for the recovery of I. G. Farben's one-half share of the profits of Bayer's business in Cuba cannot be said to further any activity condemned by the anti-trust statute.

I cannot agree with the defendant's position that the legality of the 1923 and 1926 contracts is of no relevancy on these motions. The determination of that issue is basic to a disposition of the matters in controversy. If the contracts are not violative of the anti-trust laws it concludes the inquiry; if they are, then we reach the other questions posed by the parties.

There appears to be no question but that when the 1923 agreement was executed Leverkusen (and later its successor, I. G. Farben) and Bayer were majors in the distribution and production of pharmaceutical drugs and products throughout the world. Indeed, no issue is raised by the defendant on this score.

This brings us to a consideration of the terms of the contracts. The preamble clauses recite that: (1) Bayer was formerly controlled by Leverkusen to carry on business in the United States and elsewhere but was no longer controlled by Leverkusen, the Alien Property Custodian of the United States having disposed of its shares in Bayer; (2) Bayer is the proprietor of various trademarks in the United States, including "Bayer" and "Bayer Cross", and also of trademarks and patents in the United Kingdom; (3) Bayer is entitled to various trademarks in Cuba, particularly the trademark "Aspirin" and "Bayer Cross", and also certain trademarks in South Africa; (4) Bayer obtained a judgment in its favor in Cuba concerning the trademarks "Bayer", "Bayer Cross" and "Aspirin" and is

also the proprietor of a patent in Cuba; and (5) Bayer and Leverkusen, each sought the removal from the Register in the United Kingdom of certain trademarks registered in the name of the other and each also filed opposition proceedings to the application made by the other to register the "Bayer Cross" mark in the Commonwealth of Australia.

The substance of the agreements deals with (1) a world wide division of the pharmaceutical market with specific areas allocated to Bayer and I. G. Farben and the exploitation of the remaining areas by a newly formed corporation in which both Bayer and I. G. Farben were to have specified interests; (2) transfer or recognition of trademarks, including future trademarks in certain areas, in favor of the party to whom an area was allocated; and (3) in the instance of Cuba, royalty payments by Bayer to I. G. Farben.

The products as defined in the agreements, include, with certain exceptions, all substances used in medicine and pharmacy, perfumes, cosmetics, toilet articles, products used for agricultural or horticultural purposes, germicides, disinfectants, drugs or chemicals used for scientific purposes, and chemicals or substances used in the production of the foregoing products.

1. I. G. Farben agreed:

(a) To discontinue selling and not thereafter sell or import any of the defined pharmaceutical products into the United States, Canada, the United Kingdom, Cuba,[9] Australia or South Africa, either directly or indirectly.

(b) Not to contest or put in issue Bayer's title or exclusive right to any trademark registered in Bayer's name, including the trademarks "Bayer" or "Bayer Cross", in the United States, Canada, the United Kingdom and Cuba.

(c) Not to license or permit others to use the name "Bayer" or "Bayer Cross" in the United States, Canada, Cuba, the

---

9. The agreement specified that "Cuba" shall be deemed to include the British possessions of the West Indies and the Islands of the West Indies, except Puerto Rico and the Virgin Islands.

United Kingdom, Australia and South Africa, and also to use its best efforts to prevent others from importing therein any of the designated products bearing such trademarks or. any of the trademarks belonging to Bayer.

(d) To assign to Bayer any trademarks or other rights including patents covering any of the defined products possessed by it in Cuba, including the good will of the business with which the trademarks were used; further to permit Bayer to register in Cuba all new trademarks which were or might be registered by it (I. G. Farben) in other parts of the world.

(e) To do its best to bring any agreements which it may have made with others to manufacture and sell any of the defined products in the United States and Canada within the terms of the current agreement.

(f) To use its best efforts to obtain for itself and for Bayer the exclusive right to manufacture and/or market in the United States and Canada any new product with respect to which I. G. Farben may have entered into agreements with third persons.

2. Bayer agreed:

(a) Not to engage in carrying on any business in the defined products in any other countries of the world not covered by the agreement (except as to "Aspirin" in Central and South America and Mexico).

(b) To pay I. G. Farben one-half of its net profits from all business in Cuba for the next fifty years, or fifty-five years if Bayer terminated the agreement at the end of fifty years.

(c) To assign and transfer to I. G. Farben all trademarks and patents owned by it in any other countries of the world not covered by the agreement with the exception of trademarks for "Aspirin" in Central and South America and Mexico.

Other restrictions were imposed upon Bayer. It agreed: not to market (except in Cuba or for Winthrop Chemical Company, Inc., in which I. G. Farben had a 50% interest) chemicals or substances of any kind to be used in the production of "any of the other products mentioned in the definition of said products" as defined; not to sell or offer for sale any goods other than those under the agreement or those it might market for Winthrop, as provided in the previous clause, and other than Aspirin and compounds of Aspirin for its own account in the United States, Puerto Rico, the Philippine and Hawaiian Islands and the Panama Zone.

3. Exploitation by Bayer Products Limited, the new company:

Bayer further agreed to organize a new company in the United Kingdom of Great Britain to be called "Bayer Products Limited" to exploit the defined products in the United Kingdom, New Zealand, Australia and South Africa. Bayer was to supply the required capital investment and I. G. Farben was to receive one-half of the net profits.

Both Bayer and I. G. Farben agreed to assign trademarks and patents possessed by them in the United Kingdom, Australia, New Zealand and South Africa to the new company.

4. The term of the agreements is fifty years (to December, 1972), with provisions for periodic ten year renewals thereafter.

In sum the agreements, which have been described as the "usual form of international cartel arrangement" [10] provide for a world wide territorial division of the pharmaceutical market. The division is as complete as words can express. Bayer was given the markets of the United States, Cuba and Canada. I. G. Farben was given all other markets except the United Kingdom, Australia, New Zealand and South Africa. The latter countries were to be exploited by the newly organized company, Bayer Products Limited.

In addition to the division of the world market, trademark rights were mutually

10. General Aniline & Film Corp. v. Bayer Co., Inc., 188 Misc. 929, 930, 64 N.Y.S.2d 492, 494.

transferred with respect to the territories according to the respective allocations. Thus I. G. Farben transferred or surrendered its trademark rights in the United States, Canada and Cuba, including in some instances patents and future trademarks, to Bayer, to which those countries were allocated. Bayer transferred its trademarks and patents in all remaining countries (except those allocated to Bayer Products Limited) to I. G. Farben. Finally, both I. G. Farben and Bayer agreed to transfer to the new company their respective trademark and patent rights in the United Kingdom, South Africa, Australia and New Zealand.

■ The allocation of the world markets of the defined pharmaceutical products amongst Bayer, I. G. Farben and Bayer Products Limited is so all pervasive as to constitute a per se violation of § 1 of the Sherman Act, which condemns "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade".[11]

■ The agreement in its essential features, at least as far as the division of territories and the exclusive use by the various corporations of the trade names "Bayer" and "Bayer Cross" and other trade names in the allocated territories is concerned, closely parallels that condemned in Timken Roller Bearing Co. v. United States.[12] Its impact in restraining trade, both domestic and foreign, is not open to serious question. It necessarily had the effect of eliminating competition both here and abroad. And while "the amount of interstate or foreign trade involved is not material * * * since § 1 of the Act brands as illegal the character of the restraint not the amount of commerce affected",[13] it is clear that in fact it was substantial. The one-half share of profits of the Cuban operation alone from 1930 to 1940 amounted to more than $600,000. General Aniline, in its complaint in the state court action, asserts that the profits for the years 1941 to 1951 total more than $3,000,000.

Finally, although the preamble clauses recite that the agreement is intended to settle trademark disputes between the parties, a fair reading of the related covenants of the agreement establish that their dominant purpose was to divide the world market among the participants. Mutual recognition and transfer of trademark rights were incidental to that major objective and were clearly intended to secure the more effective enforcement of the division of territories and their exploitation.[14] Here as in the Timken case,

11. United States v. Timken Roller Bearing Co., D.C.N.D.Ohio, 83 F.Supp. 284, 307, 310, affirmed 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199; United States v. National Lead Co., D.C.S.D.N.Y., 63 F.Supp. 513, 523, affirmed 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077; United States v. American Tobacco Co., 221 U.S. 106, 182, 31 S.Ct. 632, 55 L.Ed. 663; United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, affirmed 175 U.S. 211, 241, 20 S. Ct. 96, 44 L.Ed. 136; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 427, 439–445, 447–448; United States v. Imperial Chemical Industries, Ltd., D.C.S.D.N.Y., 100 F.Supp. 504, 593; United States v. General Dyestuff Corp., D.C.S.D.N.Y., 57 F.Supp. 642, 647.

12. 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199.

13. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224, note 59, 60 S.Ct. 811, 845, 84 L.Ed. 1129.

14. The methods here adopted to restrain competition have been aptly described as follows: "In implementing a division of world markets, some cartels have parcelled among their members rights in a trade-mark on a geographical basis. All the parties sell the same product under the same mark, one operating in the United States, another perhaps in South America, and others in various parts of Europe. The apportionment of territorial rights in a mark can be an effective device to prevent shipment of the trade-marked product from one market to another. Indeed, under such an arrangement the courts can be used to enforce and police the cartel restriction." Handler, Trade-Marks and Anti-Trust Laws, 38 T.M.Rep. 387, 389.

Cf. United States v. Imperial Chemical Industries, D.C.S.D.N.Y., 100 F.Supp. 504, 518. "Not only are the patents and processes agreements susceptible to be-

the trademark provisions " 'were subsidiary and secondary to the central purpose of allocating trade territories.' " [15] The agreements here went far beyond any protection required for the trademarks. I. G. Farben, in the case of Cuba, not only agreed not to contest Bayer's title to "Bayer" or "Bayer Cross" (which the agreement states had already been judicially determined in Bayer's favor) and to assign to Bayer all its trademarks and patents in Cuba, but also agreed to permit Bayer to register there all future trademarks including so-called house or establishment names registered by I. G. Farben in other parts of the world. Thus trademarks not yet in existence were yielded.[16] I. G. Farben also agreed not to license others to use the name "Bayer" or "Bayer Cross" in the United States, Canada and Cuba, countries allocated to Bayer. Significantly, I. G. Farben also undertook to bring any arrangements it may have made with others for the sale of the products in the United States and Canada within the terms of the agreement.

We next consider whether the illegality of the agreement requires that General Aniline, as claimant of I. G. Farben's share of the Cuban profits, be enjoined from enforcing its claim. General Aniline not only resists the government's motion for injunctive relief but affirmatively asks that its motion for summary judgment be granted on the ground there is no showing that it is violating § 1 of the Sherman Act by restraining trade in pharmaceutical products. The substance of this argument is that (1) General Aniline and Bayer are engaged in entirely dissimilar and noncompetitive businesses —General Aniline manufactures dyes, industrial chemicals, photographic equipment and supplies; Bayer manufactures pharmaceutical products, the subject matter of the agreement; (2) there is no evidence of restraint of trade in pharmaceutical products since 1941 when the consent decree was entered against Bayer, or since 1942 when the Alien Property Custodian vested the stock of General Aniline,[17] or since 1945 when I. G. Farben was seized by the Allied powers and subsequently dissolved; and (3) the maintenance of the New York law suit to recover profits does not restrain trade.

The dissimilarity of business argument rather naively disregards the fact that it is I. G. Farben and not General Aniline which is the party to the illegal agreement; that I. G. Farben was in the pharmaceutical business; that it was, and either it or its successor remains, the beneficiary of the slicing of the world pharmaceutical pie.

It overlooks the fact that the contract is still alive with almost twenty-five years to run and may, under its terms, be extended beyond its expiration date. Further, that I. G. Farben's rights, despite its alleged dissolution, have passed on to a successor [18] which (since neither was

ing apt instruments of territorial divisions, but the very first such agreement was deliberately entered into with a view to effectuating that illegal purpose."

15. Timken Roller Bearing Co. v. United States, 341 U.S. 593, 598, 71 S.Ct. 971, 975, 95 L.Ed. 1199.

16. Cf. United States v. National Lead Co., D.C.S.D.N.Y., 63 F.Supp. 513, 523–524.

17. In 1942 and 1943, the Alien Property Custodian vested approximately 97% of General Aniline's stock upon a finding that it was owned by I. G. Farben, an enemy national. 7 Fed.Reg. 3148, 8 Fed. Reg. 2453.

18. On February 10, 1954, the Tripartite I. G. Farben Control Group ruled the agreements had not been terminated and that the rights and obligations of I. G. Farben thereunder had been transferred to Farbenfabriken Bayer Aktiengesellschaft.

The permanency of the agreements is underscored by a provision that "I. G. Farben" also includes: its successors or assigns, whether by operation of law, merger, fusion, consolidation, and any present or future constituent or subsidiary firms. Further: "In the event that any present or future constituent or subsidiary firm or corporation shall cease to form a part of or be included in I. G. [Farben], this agreement shall nevertheless remain in full force and effect be-

named a defendant in this action).[19] is in a position to assert its validity and to ·seek enforcement of its terms.[20] It also overlooks the fact that General Aniline's right to recover under the 1931 letter of instruction is dependent upon continued performance of the agreement by I. G. Farben or its successors. When General Aniline alleges, as it does in its complaint and as it must to succeed, that its assignor has duly performed the conditions of the agreement from the years 1923 through 1951, it is saying, amongst other things, that I. G. Farben has withdrawn from competition in the areas allocated to others. Thus recovery by General Aniline of the one-half ·share of the Cuban profits is conditioned upon proof of continued violation of the anti-trust laws. And enforcement of any claims for its share of future profits must be similarly conditioned.

General Aniline, by its state court action, has plainly demonstrated its purpose to enforce the contract which the Court finds violative of the Sherman Act. Every assertion by General Aniline of due performance by its assignor serves to give the agreement fresh vitality and to nourish it for the remainder of its term. To permit General Aniline to assert its present and future claims for I. G. Farben's share of the Cuban profits is tantamount to giving the Court's seal of approval to an illegal agreement which is destructive of our national policy of keeping open the avenues of competition; it is in effect asking the Court to condone or to disregard "perennial violation".[21]

■ There can be little doubt that if I. G. Farben were before the Court an injunction would issue. General Aniline, which stands in I. G. Farben's shoes, is in no better position. To uphold the defendant's contention that because it is engaged in a dissimilar business from Bayer, or that its assignor is no longer in business, would at once recognize an effective means to frustrate the intent of the anti-trust laws. Under this concept all a foreign party to an illegal agreement need do is to remain beyond the jurisdiction of the Court, effect an assignment of the proceeds of the agreement (in this case to an affiliated company) and have its assignee enjoy the fruits of the illegal contract free of governmental sanction. The public policy underlying the anti-trust laws is not to be frustrated so easily. Since "it is the unlawful agreement, whether it is executed or not, which violates the anti-trust laws",[22] the Court is justified in enjoining any action to realize the proceeds of the tainted agreement, particularly so where the action serves to keep the agreement alive and to encourage future violations.

General Aniline urges that to bar recovery of the Cuban profits means a windfall to Bayer. Without conceding the validity of this position, the short answer is:

■ "[A] court will not lend its aid, in any way, to a party seeking to realize the fruits of an agreement that appears to be tainted with illegality, although the result of applying that rule may sometimes be to shield one who has got something for which, as between man and man, he ought, perhaps, to pay, but for which he is unwilling to pay.

"In such cases the aid of the court is denied, not for the benefit of the defendant, but because public policy demands

---

tween New York [Bayer] and I. G. [Farben], and shall continue to remain binding upon such constituent or subsidiary firm or corporation." Paragraph 4 of the 1926 Agreement modifying Paragraph 23 of the 1923 Agreement.

19. General Aniline & Film Corp. v. Bayer Co., Inc., 305 N.Y. 479, 113 N.E.2d 844.

20. I.e., until there is a determination to the contrary.

21. Cf. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 74, 31 S.Ct. 502, 55 L.Ed. 619.

22. Edward Katzinger Co. v. Chicago Metallic Mfg. Co., 329 U.S. 394, 397, note 3, 67 S.Ct. 416, 418, 91 L.Ed. 374.

that it should be denied without regard to the interests of individual parties." [23]

Other issues remain. The defendant next urges that the request for injunctive relief should be denied as an interference with the New York State courts contrary to the prohibition contained in 28 U.S.C. § 2283. [24]

The answer is that § 4 of the Sherman Act grants the United States District Court jurisdiction "to prevent and restrain violations" of the Act. [25] The injunction is a necessary incident to the Court's power in order to effectuate its judgment that the Bayer contracts are illegal. [26] Simply to declare the agreement illegal and at the same time permit recovery of the proceeds would render the decree of the court quite sterile. The purpose of the decree is not only to prevent repetition of past offenses but also "to prevent the defendants from acquiring any of the fruits of the condemned project." [27] Moreover, jurisdiction was expressly reserved under the terms of the original decree [28] in this action and long before the filing by General Aniline of the state court suit. And it should not go unnoticed that the New York State Court of Appeals invited, at least inferentially, the disposition of the issues by the federal court. [29]

Finally, the defendant contends that even assuming the illegality of certain provisions of the agreement, those sections which relate to Cuba and payments of Cuban profits to I. G. Farben are legal and severable from the balance of the agreement: that in any event whether or not the parties intended severability is a question of fact which precludes the grant of summary judgment. I cannot agree. This is a balanced agreement to effect a division of world markets with reciprocal covenants by each of the parties to achieve that purpose. The various mutual covenants with respect to territorial allocations, including Cuba to Bayer, are all interrelated parts of the plan. Thus to cite one example, Bayer agreed "so long as the arrangements covered by this Agreement are subsisting", it would not "directly or indirectly carry on * * * any business in the said products in any other countries of the world not covered by the terms of this Agreement", and by the same clause also agreed to assign all its trademarks and patents in any other countries of the world not covered by the agreement. The removal of one covenant from the agreement would

23. Continental Wall Paper Co. v. Louis Voight & Sons Co., 212 U.S. 227, 262, 29 S.Ct. 280, 292, 53 L.Ed. 486.

24. "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.

25. 15 U.S.C.A. § 4.

26. Cf. United States v. Bates Valve Bag Corp., D.C.D.Del., 39 F.2d 162, 165.

27. Mr. Justice Douglas (dissenting only as to the extent of the decree) in United States v. National Lead Co., 332 U.S. 319, 367, 67 S.Ct. 1634, 91 L.Ed. 2077. And see United States v. Crescent Amusement Co., 323 U.S. 173, 188, 65 S.Ct. 254, 89 L. Ed. 160.

28. Paragraph V of the consent decree, United States v. The Bayer Company, Inc., D.C.S.D.N.Y., Civ. No. 15–364, September 5, 1941.

29. General Aniline & Film Corp. v. Bayer Co., Inc., 305 N.Y. 479, 485, 113 N.E.2d 844, 847. "A question that naturally presents itself is where the issues involved should first be tried. Its answer depends, of course, upon considerations of comity and orderly procedure. Accordingly, should a stay of the present action be sought, it will be pertinent to consider among other matters whether it is in the state or in the federal forum that a more complete disposition of the issues may be obtained and whether it is the federal or the state court that possesses a greater familiarity and expertise with the trial of such issues."

cause the fall of the entire structure which the parties built.

 Bayer's obligation to pay royalties is interlaced with all other obligations in the agreement—its own as well as those of I. G. Farben. To view the Cuban covenant in the light of the staking out of the world market, with corresponding clearances and transfer of trademarks to each allocated segment, as severable from all others is to fly in the face of reality. Nothing in the agreement supports the assumption that the parties so intended. On the contrary, a fair reading of the whole instrument compels the conclusion that it is an entire and integrated one.[30]

The plaintiff's motion for summary judgment is granted and the defendant's cross motion is denied.

The government is entitled to a decree (1) declaring the agreements to be unlawful; (2) enjoining the defendant General Aniline from enforcing the agreements either directly or indirectly; and (3) enjoining the defendant from continuing or instituting any litigation looking towards their enforcement.

The plaintiff is requested to submit within ten days proposed findings of fact and conclusions of law based upon the foregoing, and either party may propose additional findings to include undisputed facts based upon the exhibits, pleadings and admissions. Thereafter, upon the filing of the Court's findings of fact and conclusions of law a decree may be proposed upon the settlement of which the parties, if they so desire, will be heard.

---

30. Cf. Edward Katzinger Co. v. Chicago Metallic Mfg. Co., 329 U.S. 394, 67 S.Ct. 416, 91 L.Ed. 374; Chicago Title & Trust Co. v. Fox Theatres Corp., 2 Cir., 91 F.2d 907, 909; Manhattan Life Ins. Co. v. Prussian Life Ins. Co., 2 Cir., 296 F. 39, 41; Schminke Milling Co. v. Diamond Bros., 8 Cir., 99 F.2d 467, 471; Rosenthal Paper Co. v. National Folding Box & Paper Co., 226 N.Y. 313, 320, 123 N.E. 766; 6 Corbin on Contracts § 1520.