The CLOROX COMPANY, Plaintiff,

v.

Sterling WINTHROP, Defendant.

No. CV 92–386.

United States District Court, E.D. New York.

Nov. 3, 1993.

Kim J. Landsman, Morrison & Foerster, New York City, for plaintiff.

John L. McGoldrick, McCarter & English, New York City, for defendant.

## MEMORANDUM AND ORDER

DEARIE, District Judge.

In this action, the defendant seeks summary judgment dismissing plaintiff's federal and state antitrust claims and related state common law claims of restraint of trade and unfair competition. For the following reasons, the defendant's motion is denied.

## BACKGROUND

This lawsuit is the latest skirmish in a 40 year battle between competing trademarks, LYSOL and PINE–SOL. The defendant, Sterling Winthrop ("Sterling"), manufactures and distributes household cleaning and disinfectant products under the trade name LYSOL. The LYSOL trademark has been federally registered for disinfectants since 1906, and for cleaning products since the 1920's. Sterling's primary product using the LYSOL name is an aerosol spray disinfectant.[1]

The establishment of the PINE–SOL trademark did not come easily. In the 1940's, Clorox Company ("Clorox")'s predecessor filed an application to register the trademark PINE–SOL for a liquid general household cleaner, disinfectant, and deodorant. Sterling opposed this registration in the U.S. Patent Office. On October 2, 1952, the Examiner in Chief sustained the Examiner of Interferences' finding of confusing similarity between the PINE–SOL mark and the LYSOL mark as used on the same or similar goods.

According to Sterling, Clorox's predecessor continued to use the PINE–SOL mark despite the Examiner in Chief's decision. Sterling sued, and the parties eventually settled the dispute by agreement executed on May 3, 1956 ("1956 Agreement"). Then, in 1965, Sterling filed suit again against the then-owner of the PINE–SOL mark, American Cyanamid Company ("Cyanamid"), alleging trademark infringement arising from Cyanamid's marketing of a PINE–SOL disinfectant spray. In 1967, a settlement agreement ("1967 Agreement"), which superseded the 1956 Agreement, ended that suit.

Pursuant to the 1967 Agreement, Cyanamid could continue to manufacture, promote, and sell its existing PINE–SOL liquid cleaner as long as Cyanamid complied with certain

---

1. This product is currently marketed in various versions including an "original scent," a "country scent," a "fresh scent," and a "light scent." Sterling also markets a disinfectant in a bottle that uses just the LYSOL name and a LYSOL deodorizing cleaner with a lemon scent. Brand extensions include LYSOL PINE ACTION pine cleaner-disinfectant, LYSOL DIRECT multi-purpose spray cleaner, LYSOL basin, tub, and tile cleaner, LYSOL and LYSOL CLING toilet bowl cleaners, LYSOL PINE FRESH CLING toilet bowl cleaner and LYSOL PINE SCENT basin, tub and tile cleaner.

conditions. The agreement provided that Cyanamid "shall not use the trademark PINE–SOL in connection with the manufacture, offering for sale, distribution, sale, advertising or promotion of any disinfectant product," (Paragraph 2(a)), except that Cyanamid could continue to "manufacture, offer for sale, distribute, sell, advertise and promote under the trademark PINE–SOL its present liquid cleaner with disinfecting and deodorizing properties," (Paragraph 3(c)), as long as this product continued to be "sold, advertised, and promoted primarily as a cleaner" rather than as a "disinfectant product." (Paragraph 4(a)).

Paragraph 4(a)(i) of the 1967 Agreement specified that, "when the generic name or purpose of the product is set forth in labels or advertising or promotional material, the generic name 'cleaner' or the generic function 'cleans' will continue to be set forth first, i.e., before such terms as 'disinfectant' or 'disinfects' or the like." Paragraph 4(a)(ii) prohibited "a display of such generic terms or functions as 'disinfectant' or 'disinfects' or the like in greater prominence than the generic name or function 'cleaner' or 'cleans,'" and Paragraph 4(a)(iii) further required that "more detailed labeling or advertising claims for the product in regard to its cleaning and disinfecting functions will be displayed in an analogous manner." (Paragraph 4(a)(i), (ii), (iii)).

The 1967 Agreement also provided, at Paragraph 4(c), that:

In the display of the trademark PINE–SOL on all labels, packages, containers, other labeling, and advertising and promotional materials, separation must be maintained between the words or syllables 'Pine' and 'Sol' by placing between those words or syllables a device representing a pine or evergreen tree as presently used, and each of such words or syllables must begin with a capital letter with the remaining letters being small letters. It is understood, however, that the mark may appear in letters of the same size and a hyphen may be substituted for the small separation device representing a pine or evergreen tree in the text of labels or advertising material where the mark is not used in large type or otherwise displayed with prominence, but even then such words or syllables must always be used in separated form.

(Paragraph 4(c)). Paragraph 5 repeated this requirement with respect to "all labels, packages, containers, other labeling, and advertising and promotional materials used in connection with the products permitted to be marketed by paragraphs 2(b), 3(a) and 3(b)" of the agreement. (Paragraph 5).

Despite the elaborate specificity of the 1967 Agreement, disagreements persisted. In 1983, Cyanamid took the offensive and brought suit against Sterling alleging that Sterling had breached the 1967 Agreement by marketing LYSOL PINE ACTION. Although Sterling contends that Cyanamid alleged that the "use of the LYSOL trademark on a pine oil cleaning product constituted trademark infringement and unfair competition," (Def. 3(g) Statement), Clorox maintains that Cyanamid challenged the product because its "trade dress copied that of the Pine–Sol cleaner." (Pl. 3(g) Statement).[2] The parties eventually resolved this dispute and other pending disputes with yet another settlement agreement negotiated in 1987 ("1987 Agreement" or "Agreement").

In the 1987 Agreement, Sterling gave considerable ground. Expanding upon the 1967 Agreement, the new agreement permitted new uses of the PINE–SOL mark. The 1987 Agreement provided that Cyanamid could use the PINE–SOL mark for a "multi-purpose pump spray household cleaner with disinfecting properties" (Paragraph 3(d)) as long as Cyanamid complied with certain conditions. These conditions included the requirement that the product "continue to be sold under a generic name indicating that it

---

**2.** Sterling maintains that, in interrogatory answers filed in the 1983 action, Cyanamid "contended that use of the trademark LYSOL for a pine oil cleaner, separate and apart from its trade dress, was likely to cause confusion with Cyanamid's Pine–Sol mark for pine oil cleaners."

(Def. 3(g) Statement). Clorox disputes this assertion calling it "materially incomplete and misleading." (Pl. 3(g) Statement). Clorox adds that it has not been "given adequate opportunity to discover information concerning documents filed in the prior litigations." (Pl. 3(g) Statement).

is a general purpose spray cleaner." (Paragraph 3(d)(ii)). For example, Paragraph 3(d)(ii) specified that, while the product could not be offered as a "special purpose cleaner, *e.g.,* 'bathroom cleaner,'" it could be promoted "for particular uses, surfaces and areas, including new uses, surfaces and areas." (Paragraph 3(d)(ii)). In addition, the Agreement required that the PINE–SOL product not be offered "in more than one delivery form, formula, or scent in a single geographical area" at a given time. (Paragraph 3(d)(iv)).

The 1987 Agreement permitted Cyanamid to use the PINE–SOL mark as part of an endorsement phrase to promote other disinfectant products under trademarks other than PINE–SOL. However, such use depended upon Cyanamid's compliance with an elaborate set of rules. For instance, the Agreement specified that the other trademark could not be used as part of the phrase that included the PINE–SOL mark, could not be likely to cause confusion with the trademark LYSOL or the trademark PINE–SOL, and had to "be, at least, capable of distinguishing the product on which it is to be used, *i.e.,* eligible to be registered on the Supplemental Register, pursuant to Title 15, U.S.C., Section 1091, as presently worded." (Paragraph 2(e)(i)). In addition, the Agreement provided that "it must reasonably appear from the wording of said phrase that it was intended to convey only the meaning that the said disinfectant product originates with the company that has marketed 'PINE–SOL' products." Accordingly, the Agreement noted that the phrases, "FROM PINE–SOL" and "FROM THE MAKERS OF PINE–SOL," would be "permissible," while "ANOTHER PINE–SOL PRODUCT" AND "CLEANS LIKE PINE–SOL" would not be permissible. (Paragraph 2(e)(ii)). The Agreement specified that PINE–SOL could be used "only once in the said phrase and must be preceded somewhere in said phrase by a word no shorter than 'FROM,'" (Paragraph 2(e)(iii)), and that "'PINE–SOL' in the said phrase shall never be displayed with 'PINE' above 'SOL', and 'PINE–SOL' must always appear on a single line." (Paragraph 2(e)(iv)).

Further, at Paragraph 2(e)(xii), the Agreement provided that "no matter may appear on the said disinfectant product or in advertising or promotional material therefor which states that the said disinfectant product is generally better than any named or displayed disinfectant product on which Cyanamid uses the trademark PINE–SOL." (Paragraph 2(e)(xii)). However, this provision did permit Cyanamid to "state in such materials that said disinfectant products are better than 'PINE–SOL' for a particular purpose, surface or area." (Paragraph 2(e)(xii)).

The 1987 Agreement explicitly retained the requirement that the PINE–SOL product not be offered in more than one form, scent or formula in a single geographic area at a given time. (Paragraph 4(e)). The Agreement acknowledged Sterling's right to use LYSOL as a mark "in connection with cleaning, disinfecting, deodorizing, laundering and personal care products for home or institutional use, and services related thereto." (Paragraph 7(a)(i)). In addition, the Agreement permitted Sterling to use the name or the mark, "PINE ACTION," as well as to use certain "PINE" designations including "PINE CLEANER," "PINE DISINFECTANT," "PINE SCENT," "PINE FRAGRANCE," "PINE ODOR," "PINE FORMULA," and "PINE FRESH."

Pine–Sol became the number one liquid all-purpose household cleaner in the United States. In August 1990, Clorox purchased the PINE–SOL trademark and products from Cyanamid. Clorox maintains that today, the PINE–SOL trademark possesses the highest recognition factor of all trademarks in the pine cleaner category. (Pl. 3(g) Statement).

On June 4, 1991, Sterling filed suit in New Jersey Superior Court alleging that a Clorox advertising campaign breached the settlement agreement by emphasizing Pine–Sol's disinfectant property. Clorox filed counterclaims based on federal and state antitrust laws. On August 15, 1991, Judge Kevin M. O'Halloran issued a preliminary injunction restraining Clorox from using the disputed advertising and tentatively rejected Clorox's antitrust counterclaims. In his decision, Judge O'Halloran noted: "[I]t is unlikely that

the defendant will be able to prove that an agreement which merely provides for emphasis in advertising could be a violation of any antitrust laws. There is no price fixing or division of markets or the like." (*See* O'Halloran, Tr. at 10). On January 28, 1992, Clorox filed this antitrust action and simultaneously moved in the New Jersey court for a stay of the state proceeding. On April 23, 1992, the New Jersey court granted the stay.

No discovery has taken place in this action and very limited discovery took place in the state action before the stay. Nevertheless, Sterling contends that the matter is ripe for summary judgment.

## DISCUSSION

### *Standard For Summary Judgment*

Fed.R.Civ.P. 56(c) provides for the granting of summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 56(c) mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Movants may discharge their burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 326, 106 S.Ct. at 2554. The evidence and all factual inferences, however, must be viewed in the light most favorable to the nonmovant. *Beacon Enterprise Inc. v. Menzies*, 715 F.2d 757, 762 (2d Cir.1983).

■ Although antitrust cases often present complex issues of fact that make summary disposition difficult to obtain, summary judgment "remains a vital procedural tool to avoid wasteful trials and may be particularly important in antitrust litigation to prevent lengthy and drawn-out litigation that has a chilling effect on competitive market forces." *Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc.*, 996 F.2d 537, 541 (2d Cir.1993) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–88, 593–94, 106 S.Ct. 1348, 1355–57, 1359–60, 89 L.Ed.2d 538 (1986)). In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–88, 106 S.Ct. 1348, 1355–57, 89 L.Ed.2d 538 (1986), the Supreme Court advised:

> [T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial' ... if the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary.... Antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case ... conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.

*Id.*

### *Restraint of Trade*

■ Clorox contends that the Agreement restrains trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as the parallel provisions of New York's Donnelly Act, N.Y.Gen'l.Bus.Laws § 340 *et seq.* (McKinney 1988).[3] Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...." 15 U.S.C. § 1 (Supp.1992). Despite the plain language of Section 1, only unreasonable restraints of trade violate the Act. *Standard Oil Co. v. United States*, 221 U.S. 1, 60, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911).

■ Courts find certain restraints of trade illegal per se, while subjecting other re-

---

3. No separate analysis is required under the Donnelly Act because this Act is "construed in light of federal precedent and given a different interpretation only where State policy, differ-ences in the statutory language or the legislative history justify such a result." *Anheuser–Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 525 N.Y.S.2d 816, 520 N.E.2d 535, 538 (1988).

straints to an elaborate inquiry known as the "rule of reason." Per se illegal restraints are "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Railway v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Examples of per se violations include horizontal and vertical price-fixing, division of a market into territories, certain tying arrangements, and certain group boycotts involving concerted refusals to deal with a competitor.

■ At least for the purposes of this motion, the 1987 Agreement is not per se illegal. A product of arm's length negotiations over a period of years, the Agreement limits the uses of the PINE–SOL mark in an apparent effort to insure co-existence between the senior and junior marks. When a restraint is not "plainly anticompetitive," *National Soc'y of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978), a factfinder must determine "whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). *See also Professional Engineers,* 435 U.S. at 691, 98 S.Ct. at 1365. This "rule of reason" approach requires consideration of the "facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable," as well as the "history of the restraint" and "the purpose or end sought to be attained." *Chicago Bd. of Trade,* 231 U.S. at 238, 38 S.Ct. at 242. *See also Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977); *United States v. Topco Assoc., Inc.,* 405 U.S. 596, 607, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972).

■ However, the "rule of reason" does not require a court to "extend the right to trial to 'anyone who files a valid cause of action ... notwithstanding the absence of any significant probative evidence tending to support the complaint.'" *Arnold Pontiac–GMC, Inc. v. General Motors Corp.,* 786 F.2d 564, 574 (3d Cir.1986) (quoting *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)). Rather, to survive summary judgment, a plaintiff must raise a genuine issue of fact concerning the anticompetitive effect of the challenged restraint. As the Second Circuit recently advised, "Under this [rule of reason] test plaintiff bears the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *Capital Imaging Associates,* 996 F.2d at 543. This rule reflects the principle that antitrust laws exist for "the protection of competition, not competitors." *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

■ Clorox contends that the Agreement unreasonably restrains trade by restricting Clorox's marketing of new products as well as its promotion of the existing PINE–SOL products. Clorox argues that, because many consumers base buying decisions on products' disinfectant properties, Clorox's inability to focus its advertising efforts on Pine–Sol's disinfectant qualities impedes Pine–Sol's ability to compete meaningfully with Lysol.

Although the Agreement only restricts Clorox's use of the PINE–SOL trademark, Clorox urges that, given existing market realities, the Agreement inhibits competition against Lysol in the cleaner-disinfectant market and its relevant submarkets. These submarkets, Clorox urges, include the pure disinfectant market, the spray disinfectant market, the pine cleaner market, and the bathroom cleaner market. According to Clorox, the importance of using a famous brand name to enter the cleaner-disinfectant market and submarkets "has become even more pronounced" since the 1980's (Savage Aff. at 10), and "[s]uccessful brand extension requires not just a well known trademark, but extension of it to use on products that is

consistent and complementary with the existing consumer associations with the well known trademark." (Pl. 3(g); Savage Aff. at 12).

The Group Marketing Manager of Clorox's subsidiary, the Household Products Company, maintains that "[s]uccessful market entries in household cleaning and disinfecting products without the use of a famous trademark have been rare in the past five years" and that companies recognize that a product that lacks a name already familiar to consumers possesses a low likelihood of success. (Pl. 3(g); Savage Aff. at 12). Clorox's manager describes Clorox's own experience with the marketing of certain products and also cites academic and business literature describing the importance of "megabrands" and brand extension. (*See* Pl.Exh. 1–3). According to Clorox, the PINE–SOL mark appears "uniquely suited to enter various new household markets, including the disinfectant spray and bathroom cleaner categories." (Pl.Rep.Mem. at 16; Savage Aff. at 20). Clorox explains that the CLOROX and FORMULA 409 products could not be extended to a disinfectant spray. The company maintains that CLOROX "carries too much association with bleach" and would "also not be appropriate for a product that had a pine scent, because it would only confuse people." (Pl. 3(g) Statement). Furthermore, according to Clorox, FORMULA 409 would not be an effective brand for extension because this product "is a spray cleaner with no disinfectant properties and less consumer association with disinfectancy." (Pl. 3(g) Statement).

Clorox argues that no legitimate trademark purposes justify the Agreement's anticompetitive effects. According to Clorox, no likelihood of confusion exists between the LYSOL and PINE–SOL marks.[4] Further, Clorox emphasizes that Sterling's use of the LYSOL mark on products that directly compete with Clorox's PINE–SOL product— such as LYSOL PINE ACTION cleaner-disinfectant—reveals that Sterling "is indifferent to any likelihood of confusion between the LYSOL and PINE–SOL trademarks that

might exist, or, more likely, knows that there is no such problem." (Pl.Rep.Mem. at 19). Thus, according to Clorox, the Agreement, rather than effectuating reasonable protection of a trademark, impermissibly protects "certain LYSOL product niches from competition." (Pl.Mem. at 3).

According to Sterling, Clorox's Section 1 claims fail as a matter of law because Clorox cannot demonstrate that the Agreement results in any anticompetitive effect. Although Clorox has had no discovery, Sterling maintains that discovery is unnecessary because Clorox's claims "make no economic sense." (Def.Rep.Br. at 25). Emphasizing that the Agreement merely limits one competitor's use of one trademark, Sterling proclaims that Clorox's claims require "the Court to accept two fundamentally absurd assumptions regarding the market in this case: that … the only company capable of competing with Sterling is Clorox, and the only trademark capable of competing with LYSOL is Pine-Sol." (Def.Rep. at 20).

The argument is overstated. While Clorox must show that the Agreement substantially and adversely affects competition and does not merely injure Clorox's own ability to compete with Lysol, Clorox need not show that the Agreement precludes competition entirely. Indeed, Sterling's position ignores the apparent logic of Clorox's contentions. Clorox asserts that only national brands with superior name recognition and the appropriate connotations for brand extension can compete as viable players in today's household cleaner-disinfectant market and submarkets. (*See* Savage Aff.; Pl.Exh. 1–3). Accepting this theory, at least for the purpose of this motion, common sense indicates that the pool of potential competitors and famous names is limited, and that an agreement that restricts even one competitor from using a famous mark could possibly implicate competitive conditions in the market. "[C]onvergence of injury to a market competitor and injury to competition is possible when the relevant market is both narrow and

---

**4.** In support of this assertion, Clorox cites a recent consumer survey commissioned by Clorox which concluded that "essentially no one in the applicable consuming public currently sees Pine- Sol and LYSOL as coming from a common source or origin." (*See* Rappeport Aff. Opp.Summ.J.; Pl.Exh. B).

discrete and the market participants are few." *Lee Shockley Racing v. Nat'l Hot Rod Ass'n,* 884 F.2d 504, 508 (9th Cir.1989). *See also Hasbrouck v. Texaco, Inc.,* 842 F.2d 1034 (9th Cir.1987).

Sterling, however, maintains that "[t]here are numerous competitors in the household products market with numerous valuable trademarks." (Rep.Br. at 25). In a Sterling affidavit, the President of the Household Product Division asserts:

> In addition to Clorox and [Sterling], there are other major companies, including Proctor & Gamble, Colgate and Dow, as well as lesser-known companies, now marketing products in the United States with cleaning or cleaning and disinfecting capabilities. These major companies market products with well known trademarks such as COMET, MR. CLEAN, TOP JOB, SPIC & SPAN, and FANTASTIC. The market is extremely competitive, and is characterized by frequent new product entries accompanied by heavy advertising and promotional campaigns.

(Healy Aff. at 3). Sterling's identification of three "major companies," in addition to Clorox and Sterling, does not refute the possibility that a few leading competitors dominate the market. Further, Sterling's focus on the "household products market" ignores Clorox's contentions regarding the existence of relevant submarkets, including, for example, the disinfectant submarket in which it is generally acknowledged that Sterling enjoys a 90% market share. Although Sterling professes its willingness to accept "as true Clorox's definition of the relevant market" (Def.Rep. at 23, n. 9), it focuses instead on competitors in the broader "household products market" and asserts that "*the market* is extremely competitive."

Indeed, whatever the precise contours of the relevant market, any determination on the issue of anticompetitive effects is premature. Although Clorox's theory may ultimately fail, Clorox's claims cannot be dismissed as "economic nonsense." (Def.Rep. at 25). Rather, Clorox must be afforded an opportunity to seek the discovery that may substantiate its allegations. Sterling complains that "[w]hat Clorox really wants is to hinder LYSOL by obtaining extensive, burdensome discovery and prolonging this litigation." (Def. Letter, August 31, 1993). Given the parties' continuing battles for position in the markets in which they compete and the courtrooms in which they have appeared, Sterling's concern is understandable. However, plaintiff presents viable claims that cannot be summarily dismissed and, absent yet another agreement, dispositive action must, at least, await discovery. Accordingly, the supervising magistrate will insure that discovery proceeds efficiently, particularly on those issues that may invite dispositive action.

■■■ At this time, the Court must also reject Sterling's assertion that, as a matter of law, the Agreement represents a valid trademark agreement rather than an unreasonable restraint of trade. In general, the protection of trademark rights does not violate antitrust laws. "Used as a means of identifying the trademark owner's products, a trademark 'makes effective competition possible in a complex, impersonal marketplace by providing a means through which the consumer can identify products which please him and reward the producer with continued patronage.'" *Anti–Monopoly, Inc. v. General Mills Fun Group,* 611 F.2d 296, 301 (9th Cir.1979) (quoting *Smith v. Chanel, Inc.,* 402 F.2d 562, 566 (9th Cir.1968)). However, since trademark laws only protect the trademark's "source-denoting function," a "trademark is misused if it serves to limit competition in the manufacture and sales of a product." *Id.* at 301. Misusing a trademark for anticompetitive purposes can violate the antitrust laws. *Timken Roller Bearing Co. v. U.S.,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1953). *See also United States v. Bayer Co.,* 135 F.Supp. 65, 70–71 (S.D.N.Y.1955) (trademark provisions "went far beyond any protection required for the trademark").

■■■ Sterling emphasizes that trademark litigation often results in settlement agreements which prohibit junior users from using trademarks absolutely, or in certain ways or on certain goods. According to Sterling, the Agreement at issue here, like thousands of other trademark settlement agreements, simply delineates the parties' respective trade-

mark rights and limits the future likelihood of consumer confusion concerning the source of the products on which the marks appear. Relying on *California Packing Corp. v. Sun-Maid Raisin Growers of California*, 165 F.Supp. 245 (S.D.Cal.1958) *aff'd*, 273 F.2d 282 (9th Cir.1959), which upheld an agreement confining the use of the SUN-MAID trademark to raisins and raisin products against an anti-trust challenge, Sterling argues that restrictions on one competitor's use of one trademark "have long been held not to constitute antitrust violations, but rather to be permissible in the trademark context." (Def.Rep.Br. at 15). *California Packing Corp.*, however, is not dispositive here. While the court in that case emphasized that "Sun-Maid ... has been free, all these years, to can anything,—vegetables or fruits—and market them under any name so long as that name is not Sun-Maid," the court's discussion provides no information regarding the market conditions at the time of the challenge and whether these conditions limited Sun-Maid's effective ability to enter the market under another name. Because antitrust considerations must be viewed in light of "actual market realities," *Eastman Kodak Co. v. Image Technical Serv., Inc.*, — U.S. —, —, 112 S.Ct. 2072, 2082, 119 L.Ed.2d 265 (1992), *California Packing Corp.* does not preclude the possibility that a trademark agreement that limits one competitor's use of one trademark could, in some instances, violate antitrust laws.

Sterling correctly notes that the Court should show some deference to the agreements that embody the parties' arm's length resolution of their differences over the competing marks. Agreements negotiated by experienced business people should enjoy some level of deference from the Court. However, the Court cannot be expected to ignore the possibility that the Agreement unreasonably restrains competition under the guise of protecting the LYSOL mark. Here, Clorox contends that the Agreement's restrictions on the use of the PINE-SOL mark serve no valid trademark purpose, but rather exist in order to foreclose competition with the LYSOL mark. On their face, several of the Agreement's restrictions do appear to go beyond that which is necessary to protect LYSOL's senior mark. Certainly if the evidence were to show that the current strength of the once inferior PINE-SOL mark removes or significantly reduces the risk of confusion, it is not inconceivable that the parties' considerable efforts in negotiating the very detailed settlement agreements were directed toward other objectives. It may be that Sterling's recognition of the acquired strength of Pine-Sol and the resulting reduction in the likelihood of confusion drove its willingness to give ground to Pine-Sol in the agreements; it is just as plausible that Sterling's objective may have at some point become fired by the objective of protecting certain product or market niches from Clorox's advance. The precise delineation of the parameters within which Clorox is permitted to deploy the PINE-SOL mark may indeed suggest that trademark protection became a secondary consideration at some point. Accordingly, without discovery on the anticompetitive effect of the Agreement or the intent behind the various provisions, the Court cannot find, as a matter of law, that the Agreement simply promotes valid trademark or other legitimate business purposes and does not unreasonably restrain trade.

*Monopolization*

■ Clorox also asserts a monopolization claim and an attempted monopolization claim pursuant to Section 2 of the Sherman Act. Sterling has moved for summary judgment on these claims as well. According to Clorox, Sterling possesses a monopoly in the spray disinfectant market and the Agreement enables Sterling to retain this monopoly. (Savage Aff. at 22). The Agreement's restrictions on advertising, Clorox alleges, reinforce Sterling's monopoly by maintaining an artificial separation between the cleaning and disinfectant categories. Without these restrictions, Clorox insists, the PINE-SOL product could and would compete as a "pure disinfectant." (Savage Aff. at 36–38). Clorox also claims that Sterling's recent attempts to enforce expansive interpretations of the Agreement threaten to exacerbate the monopolistic effects of the Agreement.

■ To establish the offense of actual monopoly under Section 2 of the Sherman Act, Clorox must show "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). As for the first element, Clorox contends that the relevant market is the market for household cleaner and disinfectant products, and, significantly, that within that market, two relevant submarkets—spray and liquid pure disinfectants—exist. Clorox maintains that Sterling possesses monopoly power in each of those submarkets, controlling over 90% of the spray disinfectant market and at least 90% of the pure liquid disinfectant market. (Savage Aff. at 22, 36). Although Sterling suggests that pure disinfectants may not be an appropriate market, (Def.Br. at 38, n. 10), Sterling does not challenge Clorox's monopoly claims on this ground for the purposes of this motion. Sterling also does not challenge Clorox's estimation of Sterling's market power or claim that this market share could not, as a matter of law, constitute a monopoly.

■ The second element requires Clorox to prove that Sterling used or attempted to use monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948). This element requires proof of exclusionary or anticompetitive intent as well as effect. *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1358–60 (2d Cir.1988). Clorox maintains that the purpose of the Agreement is "to maintain [LYSOL's] monopoly in the spray and pure disinfectants submarkets by prohibiting entry of a major competitor." (Pl.Br. at 67). Clearly, Clorox requires discovery to attempt to seek to prove this contention. However, once again, Sterling counters that these monopolization claims fail in any event because Clorox cannot establish an anticompetitive injury. As previously discussed, resolution of the Agreement's anticompetitive effects will await discovery. Moreover, although

Sterling boasts that Lysol's success is due to superior product or business acumen and not because of the Agreement's restrictions on the PINE–SOL mark, this argument, in addition to raising an issue of material fact, begs the question of the anticompetitive intent and effect of the Agreement.

Sterling's assertion that the *Noerr–Pennington* doctrine bars Clorox from relying on the state litigation to establish exclusionary conduct need not concern the Court at this point because Clorox's claims of exclusionary conduct do not rely solely on the initiation of litigation. Rather, Clorox also asserts that the Agreement excludes competition by "preventing PINE–SOL products from entering the spray disinfectant submarket, creating and maintaining an artificial separation between household cleaners and disinfectants, and, more generally, placing complex restrictions on the use, marketing, and promotion of the PINE–SOL mark." (Pl.Br. at 69).

However, in the interest of clarifying issues for trial, one aspect of Clorox's claims with respect to the state court litigation warrants attention. Clorox alleges that the *Noerr–Pennington* doctrine does not apply because the state court litigation initiated by Sterling to enforce the Agreement constitutes a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 511, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972). Clorox expounds, "If Sterling knew that there was no likelihood of confusion between the LYSOL and PINE–SOL marks ... then a reasonable jury could conclude that Sterling knew that there was no legitimate ancillary purpose to an anticompetitive agreement and therefore that the New Jersey action was sham litigation." (Pl.Br. at 71). Clorox's emphasis on the existing likelihood of confusion between the PINE–SOL and LYSOL marks is misguided. Even if true, the mere fact that confusion does not now exist between the LYSOL and PINE–SOL trademarks means little. If no confusion exists between the two marks because the Agreement has been effective in preventing such confusion, the lack of confusion neither

means that the Agreement serves no valid trademark purposes nor renders the state court litigation a sham. The current likelihood of confusion between the two marks may be relevant, but is by no means dispositive, of the question of whether a "legitimate ancillary purpose" exists to justify the Agreement's purported anticompetitive effects.

### Claim Preclusion

█ Sterling argues that *res judicata* bars Clorox's claims. According to Sterling, Clorox's predecessor, Cyanamid, sought termination of the 1967 Agreement in two litigations in 1983 and 1986 and did not argue that the 1967 Agreement violated antitrust principles. Sterling maintains that since that litigation ended by stipulations of dismissal with prejudice, Clorox is now barred from raising antitrust claims that could have been raised in those litigations. The Court rejects Sterling's argument. The settlement of the prior litigations did not perpetually immunize Sterling from antitrust scrutiny. Clorox maintains that its claims are based on changed circumstances. Clorox cites the anticompetitive effects of the present Agreement in the current market, Sterling's efforts to enforce expansive interpretations of the Agreement, and the disappearance of any likelihood of potential for confusion between the two marks. (Pl.Br. at 74). Further Clorox broadly opines that the 1987 amendments to the Agreement "altered virtually every operative paragraph of the prior agreement, creating new anticompetitive effects and giving rise to new antitrust violations." (Pl.Br. at 84). Whether these antitrust claims are of recent vintage and whether the claims could have, or should have, been raised on an earlier occasion, critical factual questions must be resolved before any preclusion may be seriously considered. *See Lawlor v. Nat'l Serv. Corp.*, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955).

### CONCLUSION

For the foregoing reasons, the Court denies Sterling's motion for summary judgment. The Court refers the parties to the assigned magistrate for a discovery conference pursuant to Rule 16 of the Federal Rules of Civil Procedure.

SO ORDERED.